UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 14-CR-468 |
| | ) | |
| BEAU B. BRINDLEY and | ) | Honorable Harry D. Leinenweber |
| MICHAEL THOMPSON, | ) | U.S. District Judge |
| Defendants. | ) | |

## MOTION OF THE UNITED STATES TO ADMIT EVIDENCE PURSUANT TO FED. R. EVID. 801(d)(2)(E)

The UNITED STATES OF AMERICA, by its attorney, LORETTA LYNCH, United States

Attorney General, James L. Santelle, United States Attorney for the Eastern District of Wisconsin,

and Assistant United States Attorneys Michael Chmelar and Mel Johnson, moves this Court to admit

certain statements against defendants Beau B. Brindley and Michael Thompson pursuant to Fed. R.

Evid. 104(a), 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

## I.      INTRODUCTION

This submission begins by providing an overview of the conspiracy that will be established at

trial.  It then discusses the law governing the admissibility of coconspirator statements under Rule

801(d)(2)(E), and outlines some of the evidence establishing the conspiracy in this case.  It then

summarizes the evidence supporting the admission of coconspirators' statements.  Finally, it

describes the basis for admission of statements beyond Rule 801(d)(2)(E).  Based on the following,

the government seeks admission of statements pursuant to Rule 801(d)(2)(E) and requests a pretrial

ruling of admissibility from the Court, in accord with *United States v. Santiago*, 582 F.2d 1128,

1

1130-31 (7th Cir. 1978) and the established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris,* 585 F.3d 394, 398, 400 (7th Cir. 2009).

## II. OVERVIEW OF THE CHARGED CONSPIRACY

The superseding indictment charges that defendants Beau B. Brindley and Michael Thompson conspired with each other and other known and unknown to commit offenses against the United States, namely, to (i) make materially false statements under oath before the United States District Court in the Northern District of Illinois, in violation Title 18, United States Code Sections 1623(a) ;and (ii) obstruct, influence, and impede official proceedings, in violation of Title 18, United States Code, Section 1512(c)(2), all in violation of Title 18, United States Code, Section 371.[1] The charged conspiracy spanned from approximately September 2008, through June 2013 and involved seven different legal proceedings in the Northern District of Illinois.

The superseding indictment alleges that the objects of the conspiracy were accomplished through the following manner and means:

- Witnesses were recruited to testify falsely in criminal trials in the Northern District of Illinois.

- Witnesses were induced to testify falsely in criminal trials in the Northern District of Illinois.

- False testimony was prepared for witnesses.

- Witnesses were directed to rehearse and memorize the false testimony.

- The false testimony was presented during criminal trials in the Northern District of Illinois.

---

[1] The superseding indictment also charges substantive offenses of obstruction of justice, in violation of Title 18, United States Code, Section 1512(c)(2) (Counts Five, Nine, Thirteen, Sixteen, and Nineteen through Twenty-One); and making a false declaration under oath, in violation of Title 18, United States Code, Section 1623(a) (Counts Two through Four, Six through Eight, Ten through Twelve, Fourteen, Fifteen, Seventeen, and Eighteen). For the purposes of this *Santiago* proffer, the United States outlines only the alleged conspiracy.

- False representations were made and caused to be made to the United States District Court for the Northern District of Illinois and to the United States Attorney's Office for the Northern District of Illinois.

- Acts done in furtherance of the conspiracy were concealed and hidden, and caused to be concealed and hidden.

The conspiracy involved false testimony and misrepresentation in the following matters: (a) *United States v. Alexander Vasquez*, Case No. 08-CR-625; (b) *United States v. Richard Harrington*, 09-CR-814; (c) *United States v. Rahshone Burnett*, 09-CR-1030; (d) *United States v. Isaac Myles*, 10-CR-647; (e) *United States v. Bennie Wilcox*, 08-CR-256; (f) *United States v. David Conrad*, 05-CR-931; and (g) *In Re*: A Witness Before the Special September 2012 Grand Jury.

## III.   GOVERNING LAW

Rule 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).

No Sixth Amendment confrontation issues are posed by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant. Such statements are not testimonial, and therefore are not subject to the Confrontation Clause. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) and *Crawford v. Washington*, 541 U.S. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

3

### A.       Existence of and membership in the conspiracy

Under *Santiago*, the trial judge must preliminarily determine whether statements by a coconspirator of defendant's will be admissible at trial under Rule 801(d)(2)(E).  In making this determination the judge must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy . . . ." *Id*. at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001).  If the Court determines the statements are admissible, the jury may consider them for any purpose.  *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Under *Santiago*, the government must make a preliminary offer of evidence to show: 1) a conspiracy existed; 2) the defendant and declarant were members of the conspiracy; and 3) the statements sought to be admitted were made during and in furtherance of the conspiracy.  *Santiago*, 582 F.2d at 1134-35; *see also, e.g., United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009).  According to *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the Court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

Seventh Circuit cases construing *Bourjaily* have held that properly admitted statements, including statements admitted under the coconspirator exception to the hearsay rule (Rule 801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy.  *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a

conspiracy, evidence of that defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (en banc).

While the Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and a defendant's participation in it, *Bourjaily*, 483 U.S. at 178-80; *Harris*, 585 F.3d at 398-99, the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson,* 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).

There is no requirement, for admissibility under Rule 801(d)(2)(E), that the government establish all elements of "conspiracy" such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548-50 (7th Cir. 1979). The government need only establish the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). Additionally, "[i]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-550; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or

facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator or schemer. *Longstreet,* 567 F.3d at 919; *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). That is the case because "[t]he crime of conspiracy focuses on agreements, not groups. True, it takes two to conspire, but the government doesn't have to prove with whom a defendant conspired; it need only prove that the defendant joined the agreement alleged, not the group." *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir. 1991).

A defendant or other declarant may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("it is irrelevant when the defendant joined the conspiracy so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A conspirator who has become inactive or less active in the conspiracy nevertheless is liable for his conspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

### B.     The "in furtherance of" requirement

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy.  *See Cruz-Rea,* 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000).  Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy.  *Cruz-Rea*, 626 F.3d at 937-38.  The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception.  *Id.* at 937 (quotations and citations omitted).  That statements were made to a government cooperating witness does not bar admission of statements otherwise "in furtherance" of the conspiracy.  *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala,* 601 F.3d 256, 268 (4th Cir. 2010).

Courts have found a wide range of statements to satisfy the "in furtherance" requirement.  *See generally United States v. Cozzo*, 2004 U.S. Dist. LEXIS 7391, *5-8 (N.D. Ill. 2004) (collecting cases).  In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement.  *Alviar*, 573 F.3d at 545 (quotations and citations omitted).  *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002).  These include statements made: (1) to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also Johnson*, 200 F.3d at 533; (2) to prompt the listener to act in a manner that facilitates the carrying out of the conspiracy, *United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997); (3) to recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937-38; *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009), abrogated on other

grounds by *United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012); (4) to identify other members of the conspiracy and their roles, *Alviar,* 573 F.3d at 545; (5) to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545; (6) to control damage to an ongoing conspiracy, *Johnson,* 200 F.3d at 533; *United States v. Molinaro,* 877 F.2d 1341*,* 1343-44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988); (7) to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995); (8) to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989). Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera,* 136 Fed. Appx. 925, 926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

## IV.     THE EVIDENCE REGARDING THE EXISTENCE OF THE CHARGED CONSPIRACY AND EACH DEFENDANT'S PARTICIPATION IN THE CONSPIRACY

### A.     Overview of the Conspiracy

Defendants Brindley and Thompson were attorneys practicing in the Northern District of Illinois. Brindley operated the Law Office of Beau B. Brindley and Associates (the "Brindley Law Office"). Thompson was an associate at the Brineley Law Office and he worked for Brindley. Blair Westover, Josh Jones, and Timothy Witczak were also attorneys who worked for Brindley at the Law

Office.  The Brindley Law Office primarily focused on federal criminal defense work in the Northern District of Illinois.

From approximately September 2008, through June 2013, Brindley, Thompson, the Brindley Law Office, and others conspired to commit offenses against the United States, namely, to make materially false declarations under oath; and to obstruct, influence, and impede official proceedings in the Northern District of Illinois.  The conspiracy involved at least the seven proceedings identified in the superseding indictment.

The conspiracy operated primarily by Brindley and Thompson, on behalf of the Brindley Law Office, recruiting witnesses to testify falsely at their own trial or the trial of another Brindley Law Office client, in the case of Richard Harrington and *United States v. Rahshone Burnett*.  The false testimony involved a material issue at trial or concerned an element of the charged offense. For example, in *United State v. Richard Harrington*, Brindley directed Mr. Harrington to falsely deny that he possessed the firearm he was charged with possessing in furtherance of drug trafficking.

To make the false testimony believable to the jury, Brindley, Thomspon, and other attorneys at the Brindley Law Office often prepared a direct examination or cross-examination for their witnesses that included answers that were consistent with the bogus defense theory to be used at trial.  Brindley, Thompson and other attorneys at the Brindley Law Office then rehearsed the proposed testimony with the testifying witnesses, who were often given scripted testimony to memorize.

In other matters, Brindley and Thompson did not recruit and use witnesses to facilitate the fraud and achieve the objects of the conspiracy. Rather, in *United States v. Conrad*, and *In Re*: A Witness Before the September 2012 Grand Jury, they made the false statements in documents filed in the district court or in communicating with the U.S. Attorney's Office for the Northern District of

Illinois.  For example, *In Re*: A Witness Before the September 2012 Grand Jury, Thompson sent a letter to an AUSA in which he falsely claimed to represent a witness scheduled to appear before the grand jury.

### B. Evidence Proving the Existence of the Conspiracy and Each Defendant's Membership in the Conspiracy

The evidence to be presented by the government easily meets the preponderance standard for proving conspiracy, membership, and that the proffered statements were in furtherance of the conspiracy.[2]  The evidence will come mainly from witnesses who were participants in suborning perjury and obstructing justice.  The government's expectations of their testimony are based on statements made by these witnesses to investigators and the witnesses' grand jury testimony.  The witnesses are corroborated by court records and materials recovered during a search of the Brindley Law Office in July 2014.  Becasue the superseding indictment covers seven judicial proceedings the evidence of the conspiracy is presented on a case-by-case basis.

### 1.  *United States v. Alexander Vasquez:*

On August 5, 2008, Alexander Vasquez was arrested after fleeing from the scene of a one-kilogram cocaine deal arranged by his cousin, Joel Perez, in Arlington Heights, Illinois.  Vasquez had arrived at that drug deal driving a Pontiac Bonneville with a secret compartment holding $23,000 in cash.  The money was to be used to buy the cocaine.  Vasquez went to trial in August 2009 represented by the Brindley Law Office.  The defense tried to offer some innocent explanation of

---

[2] The government is not detailing all of its evidence that would go to show the existence of the conspiracy or each defendant and other declarant's participation in it.  Rather, this proffer highlights for the court some of the government's evidence in order to establish, by a preponderance of the evidence, the existence of the conspiracy, the membership of various conspirators, and statements in furtherance of the conspiracy.  Thus, this proffer does not list all of the government's witnesses nor does it provide all of the evidence that will be presented by those witnesses that are named.

why Vasquez brought $23,000 concealed in a trap, to a drug deal.

In the case at bar, Vasquez will testify that he was guilty of conspiring to possess a kilogram of cocaine since he knowingly drove to the drug deal with the $23,000 concealed in his car. Joel Perez, his cousin and drug-dealing partner, will corroborate that. Vasquez will further testify that Brindley knew that he was guilty too because Vasquez had told him that he knowingly participated in the cocaine deal.

However, Vasquez will testify that Brindley proposed they commit perjury to avoid a conviction. Brindley initially wanted Vasquez to testify that he drove the Pontiac Bonneville to the drug deal to pick up Perez, at Perez's request, not knowing about the cocaine deal or knowing that the car held the money needed to buy a kilo of cocaine.

Vasquez will testify that Brindley also proposed that Perez could testify for Vasquez. The plan, as expressed by Brindley, was that Perez would plead guilty but not concede any facts which established the guilt of Vasquez. Perez would then be in a position to testify that Vasquez had no knowledge of the cocaine deal. Vasquez and Perez would both testify that Vasquez, in turn, proposed Brindley's plan to Perez. Perez did not go along with the plan and entered into a plea agreement with the government.

After Perez pled guilty with a statement of facts conceding Vasquez's guilt, the search for a witness to help Vasquez with false testimony focused on Marina Collazo, Perez's wife (then known as Marina Perez). Collazo will testify that she was induced by Brindley, Vasquez, and Marilyn Cortes to meet with Brindley about testifying for Vasquez. Collazo will testify that Brindley provided her with a false story to give at trial. Brindley directed Collazo to testify that she was supposed to use the Pontiac Bonneville to pick up Perez in Arlington Heights, but did not want to, so

11

she asked Vasquez to do it using that car. Collazo and Brindley knew that this story was false, but she agreed to testify to that story to help Vasquez. Collazo has already pled guilty to conspiring with Brindley to commit perjury in Vasquez's trial.

Marilyn Cortes will testify that she went with Collazo to meet Brindley at his office. Cortes was with Brindley and Collazo when Brindley told Collazo to lie about what happened on August 5, 2008. Cortes was also present when Brindley and associates, including one named Mike, rehearsed Collazo in the false testimony. The evidence will reflect that the only associate of Brindley's named "Mike" is Michael Thompson.

During the execution of the search warrant, agents located several documents corroborating the government's witnesses and that establish the existence of the charged conspiracy. For example, agents located four versions of a direct examination for Vasquez. Those documents describe conflicting reasons why Vasquez was arrested at a drug deal driving a car that contained approximately $23,000 secreted in a hidden compartment in the car. Agents also located a notepad used by Vasquez to take notes during his trial. In the notes are several references to what Vasquez will testify was his promise of a potential $150,000 payment to Brindley if he secured an acquittal. Also recovered during the search of the Brindley Law Office were notes taken by an attorney at the Brindley Law Office during an interview of Vasquez. The writing appears to be Brindley's. The interview notes conflict in material ways with the defense theory at trial and the perjured testimony of Marina Collazo.

The statements made by Brindley and others, about presenting perjury in the Vasquez case were clearly made in furtherance of the conspiracy and constitute admissible non-hearsay because the statements were made to prompt the listener to act in a manner that facilitated the carrying out of the

12

conspiracy, *Monus*, 128 F.3d at 392; and to recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937-38; *Haynes*, 582 F.3d at 705.

2. *United States v. Bennie Wilcox*

Court records reflect that Bennie Wilcox was charged with sending threatening interstate communications. Mr. Wilcox went to trial in December 2010, represented by Brindley and Thompson. Some of the charges against Bennie Wilcox were based on harassing emails sent using an email account that belonged to individual named Jessica Hensley. Evidence showed that Ms. Hensley's email account had been accessed from Bennie Wilcox's office using his computer a few days before the harassing emails were sent also using her account. When the FBI questioned Bennie Wilcox about the harassing emails, he admitted that he was responsible for sending them.

At trial, the defense argued that Bennie Wilcox falsely confessed to the FBI in order to protect his then girlfriend, now ex-wife, Karilyn Wilcox. During opening statements, Brindley told the jury that Karilyn Wilcox accessed Jessica Hensley's email account while at Bennie Wilcox's office, using his work computer. Brindley argued that Bennie Wilcox falsely confessed because he knew Karilyn Wilcox had accessed Hensley's account from his office and he thought she might be responsible for sending the harassing emails from Hensley's account. In a pre-trial filing, Brindley described Bennie Wilcox's confession as a "misguided attempt at chivalry."

In the morning of December 7, 2010, just before Karilyn Wilcox testified, the Office of the United States Attorney for the Northern District of Illinois disclosed evidence that related to an IP address associated with Karilyn Wilcox's employer and its use to access Bennie Wilcox's email account on June 6, 2007 and June 8, 2007. That evidence conflicted with the defense theory that Karilyn Wilcox was responsible for accessing Jessica Hensley's email account from Bennie

Wilcox's office.

Karilyn Wilcox will testify that, shortly before she testified, Thompson explained to her that they had received new evidence that was problematic. Thompson suggested that she testify that someone else she worked with accessed Bennie Wilcox's email account from her work. Thompson further suggested she should come up with someone who was no longer employed at her company.

Upon questioning by Brindley, Karilyn Wilcox testified at trial to the false story that someone named Mary, who no longer worked with her, checked Bennie Wilcox's email account while she was out of the office. That lie allowed Brindley and Thompson to continue to argue that Karilyn Wilcox, not Bennie Wilcox, accessed Jessica Hensley's email account from his office on June 6, 2007 and June 8, 2007.

In addition to proving the existence of the conspiracy and each defendant's membership in the conspiracy, the statements described above are admissible non-hearsay under Rule 801(d)(2)(E). The statements made by Thompson and Brindley to Karilyn Wilcox, the court, and the jury about her false testimony, constitute coconspirator statements admissible against each of them. Those statements were made in furtherance of the conspiracy in order to prompt the listener to act in a manner that facilitates the carrying out of the conspiracy, *Monus*, 128 F.3d at 392; and to recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937-38; *Haynes*, 582 F.3d at 705. The statement were also made to generally achieve the objects of the conspiracy. *See United States v. Sinclair*, 109 F.3d 1527, 1534 (10th Cir. 1997).

### 3. *United States v. Richard Harrington*

Richard Harrington was charged with crimes involving drug trafficking, money laundering, and using and carrying a firearm in furtherance of his drug trafficking activities. He pled guilty to

the drug trafficking and money laundering counts, but went to trial on the firearm charge. That charge was based on a handgun found in Harrington's truck when he was arrested for heroin trafficking. At his trial, Harrington falsely denied that he owned the gun that was found in his car when he was arrested.

Harrington will testify as follows. Brindley knew that Harrington owned and possessed the gun seized from his truck because Harrington told Brindley that it was his gun. Harrington told Brindley that he carried the gun in connection with his drug dealing activities. However, Brindley told Harrington to give the false story that the gun was not his and must have been left there by someone else. Brindley provided the story to Harrington in the form of scripted questions and answers that Harrington was expected to memorize for his direct examination. Brindley and other attorneys at the Brindley Law Office practiced the false version events with Harrington. Brindley assured Harrington that the false version of events would guarantee an acquittal on the gun charge. Harrington proceeded to give the false testimony consistent with the script.

Harrington will be corroborated by several documents found at the Brindley Law Office. One is a February 18, 2011 letter from Thompson to Harrington that included an updated copy of his proposed direct examination that contained false denials about possessing the gun from his truck. The letter referred to a possible need to make further adjustments to the proposed direct examination due to recent developments in Harrington's case. There was also an email dated December 9, 2011, from Brindley to associate Josh Jones that included a revised script for Harrington. Brindley directed Josh Jones to go over the scripted questions and answers with Harrington to be sure that Harrington is aware of certain points and testifies to them.

All of the statements made by Thompson and Brindley, orally or in writing, to Harrington and to the court and jury about Harrington's false testimony would constitute coconspirator statements admissible against each of the defendants because they were made in furtherance of the conspiracy. Additionally, those statements, and the acts of creating bogus direct examinations and reviewing them with Harrington establish the existence of the conspiracy and each defendant's membership in the conspiracy.

### 4. United States v. Isaac Myles

On or about April 7, 2011, Myles was charged with multiple firearm offenses and drug trafficking, including possession of a firearm in furtherance of drug trafficking. Myles retained the Brindley Law Office to represent him on those charges. At trial, Myles was represented by Brindley. At his trial, Myles testified that he bought the gun found under the mattress in his bedroom to protect his house from burglars, and that he had never carried the gun in connection with drug trafficking.

Myles will testify that his testimony about his use of the gun was false. Myles also lied about when he bought the gun. Myles will testify that he regularly used and carried it to protect himself and his drugs as part of a heroin business. Brindley knew that Myles's testimony was false because Myles had told him the truth about owning the gun. Brindley instructed Myles to give false answers that Brindley thought would prevent a conviction. Brindley provided Myles with a proposed direct examination that contained a series of questions and false answers related to Myles's use and ownership of the firearm. Brindley instructed Myles to memorize the proposed direct examination questions and answers for trial.

The statements Brindley made to Myles and to the court and jury about Myles's false testimony would constitute coconspirator statements admissible against each of the defendants

16

because they were made in furtherance of the conspiracy at a time when each defendant was a member of the conspiracy. Additionally, those statements are admissible to establish the existence of the conspiracy and Brindley's membership in the conspiracy.

### 5. *United States v. Rahshone Burnett*

Rahshone Burnett, also represented by the Brindley Law Office, was charged in a heroin conspiracy, which went to trial in February of 2013. Brindley recruited Richard Harrington to testify as a defense witness at Burnett's trial. Harrington testified to a number of "facts" to support the defense theory that his relationship regarding heroin with Burnett was strictly one of a buyer/seller, not a conspiracy. Harrington testified that he never provided heroin to Burnett before Burnett paid for it; that he and Burnett had no agreement or understanding as to what Burnett would do with the heroin in bought from Harrington; that they never combined money to buy heroin together; and that Burnett was not part of the heroin conspiracy that Harrington pled guilty to.

Harrington will testify that this testimony given by him in the Burnett case was false on each of these specific points. Brindley knew that it was false because, while he was representing Harrington, Harrington told him the truth about his heroin dealings with Burnett. After Harrington's sentencing, he was sent to the federal prison in Greenville, Illinois. Before Burnett's trial, Brindley and Josh Jones traveled to Greenville to ask Harrington to testify on behalf of Burnett. In later meetings at Greenville, several of Brindley's associates, including Thompson, met with Harrington to prepare him to testify. The attorneys told Harrington that they needed him to keep Burnett out of the conspiracy and went over the specific things that Harrington needed to say. Once Harrington was transferred to the Metropolitan Correctional Center in Chicago shortly before the Burnett trial,

Brindley met with Harrington several times to practice the false testimony he would give on Burnett's behalf.

Harrington is corroborated by documents found in the search of the Brindley Law Office. One is an undated and untitled typed out statement about preparing Harrington for his testimony regarding Burnett. It is in the form of instructions for preparing Harrington and includes instructions as to how Harrington should testify on certain points including things that Harrington will testify are false. It includes an emphasis on the points used to argue that Burnett was not Harrington's coconspirator. In addition, a February 3, 2013 email from Brindley to Josh Jones encloses cross-examination to practice with Burnett emphasizing certain answers that Brindley wanted Burnett to give. Harrington will testify that those answers were false.

All of the statements made by Brindley, Thompson, and the other associates to Harrington and Burnett about false testimony as well as statements to the court and jury about that false testimony would constitute coconspirator statements admissible against each of the defendants. Likewise, the statements and acts described above establish the existence of the conspiracy and each defendant's membership in the conspiracy.

6. *United States v. Conrad*

On or about February 5, 2010, in the United States District Court for the Northern District of Illinois, David Conrad was convicted of committing multiple federal crimes, in the case of *United States of America v. David Conrad*, 05-CR-931. Conrad was represented by Beau Brindley and Michael Thompson.

18

On or about April 5, 2010, following Conrad's conviction, the United States District Court revoked Conrad's bond, and Conrad was imprisoned at the Metropolitan Correctional Center in Chicago.

On April 7, 2010, Brindley and Thompson prepared a "Status Report" that Brindley filed with the court. In the Status Report, Brindley and Thompson stated the following with respect to Conrad's physical condition during the meeting between Brindley and Conrad at the Metropolitan Correctional Center: "The meeting was rendered very difficult by Mr. Conrad's extreme illness. Mr. Conrad was sweating profusely during the meeting. His hands shook violently . . . The meeting was twice interrupted by Mr. Conrad leaving the room to vomit."

On April 8, 2010, the district court held a hearing on the contents of the status report filed by Brindley and Thompson in order to "develop[e] the record in [the] case as to Mr. Conrad's status and whether or not he was fit to be sentenced." The status report was then shown to contain false representations about Conrad's physical condition during the meeting with Brindley at the Metropolitan Correctional Center. Documents submitted by Thompson and Brindley to the court on this matter would be coconspirator statements under Rule 801(d)(2)(E). Those documents also serve to show the existence of the conspiracy and each defendant's membership in the conspiracy.

7.        *In Re: A Witness Before the September 2012 Grand Jury*

On or about October 16, 2012, Charisma Tabor was subpoenaed to testify in the grand jury on October 23, 2012. On October 23, 2012, Thompson wrote a letter to an AUSA in Chicago, who was participating in the investigation in which Tabor was subpoenaed. In that letter, Thompson stated that he was retained by Charisma Tabor and that Charisma Tabor "intend[ed] to assert her Fifth Amendment rights and decline to answer any substantive questions posed to her if called before

the grand jury." The letter was drafted on the letterhead of the Brindley Law Office. As a result of Thompson's letter, Charisma Tabor's grand jury appearance was cancelled.

On November 5, 2012, the AUSA wrote to Thompson stating that the government believed Brindley's Law Office had a conflict representing both Tabor and Tabor's brother. Three days later, Thompson wrote an email to the AUSA stating that, based on his conversations with Tabor, he had not thought there was a conflict but that he would recommend to her that she obtain new counsel.

Tabor will testify that she was subpoenaed and went to see Brindley, her brother's attorney, about it at the suggestion of her brother's girlfriend just to find out what was happening. Tabor and Brindley never discussed the substance of what her testimony would be. Brindley told Tabor only that he would take care of it. Brindley was not her lawyer, she never asked him to be, she never paid him, and she did not even know his last name.

Regarding Thompson, Tabor would testify as follows. She did not ask Thompson to represent her. She never paid Thompson. She never told him she wanted to assert her rights under the Fifth Amendment. She never intended to assert her rights under the Fifth Amendment. She never authorized Thompson to write to the U.S. Attorney's Office on her behalf. She does not even recall meet Thompson.

All of the statements, oral and written, made by defendants to Tabor or the U.S. Attorney's Office constitute co-conspirator statements admissible against each of them under Rule 801(d)(2)(E). They likewise establish each defendant's membership in the charged conspiracy.

## V.    EXAMPLES OF COCONSPIRATOR STATEMENTS

The government will seek to introduce statements made by Brindley, Thompson, and others in furtherance of the conspiracy. The statements made in furtherance of the conspiracy that the

20

government intends to offer at trial fall into several categories, all concerning subjects that were integral to the conspiracy and its success.[3] These statements will be introduced primarily through the testimony of Alexander Vasquez, Marina Collazo, Joel Perez, Marilyn Cortez, Richard Harrington, Isaac Myles, and Karilyn Wilcox.[4] Those statements were made by the defendants during the course of the conspiracy in order to achieve the objects of the conspiracy. Other statements will be introduced through evidence recovered during the execution of the search warrant at the Law Office.

Brindley and Thompson directed witnesses to commit perjury to achieve the objects of the conspiracy. Those statements to various government witnesses would be admissible coconspirator statements made in furtherance of the objects of the conspiracy. For example, as described above, Brindley directed Harrington to deny ownership and possession of the .40 caliber firearm seized at the time of Harrington's arrest. The statement from Brindley to Harrington would be admissible non-hearsay under Rule 801(d)(2)(E).

---

[3]The government is not detailing each and every proposed coconspirator statement of each witness or document but rather a representative sample of the statements from each witness and/or document. Further, by presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed. Of course, the government is committed to establishing the *Bourjaily* predicates at trial and the ultimate admissibility of coconspirator statements is governed by the trial evidence.

[4]As discussed in more detail below, a number of out-of-court statements from these sources will be admissible without regard to the coconspirator hearsay rule, because they are statements not offered to prove the truth of the matter asserted, or for other reasons. A defendant's own statements, for example, are admissible against him pursuant to Rule 801(d)(2)(A), without reference to the coconspirator statement rule. *United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). The coconspirator statement rule is also not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a). This rule defines "statement" as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Thus, a statement which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See, e.g., United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985).

Brindley also made numerous statements that would qualify as non-hearsay under Rule 801(d)(2)(E) during the cases against Mr. Harrington, Mr. Myles, Mr. Burnett, Mr. Wilcox, and Mr. Vasquez. For example, during the case of *United States v. Bennie Wilcox*, Brindley made the following statements to the court in the context of a motion to preclude the government's rebuttal case after he learned the expected evidence contradicted the defense theory and Ms. Wilcox's anticipated testimony:

> Now I'm in a position where I've made promises to the jury about what our case is going to be and what witnesses we will call based on what the evidence was that I was given, and I wasn't given this.

> Your Honor, this is information they knew was going to be relevant. They did not turn it over. They kept it and didn't pursue it at the time when they should have, and now they want to bring it up at the last minute where I'm in a position where I've already got my case going and have presented a strategy, and if this is going to impact that strategy in some way it's unfair for me and for the defendant because, I mean, he has to prepare his defense based on the evidence he believes is out there.

And during closing arguments Brindley stated the following with respect to materiality of Ms. Wilcox's credibility and her false testimony that an individual named "Mary" accessed Mr. Wilcox's email account:

> [The United States] ha[s] to prove that she [Karilyn Wilcox] lied, and so the question is: Can they? After she testified, you got to witness how that went. They believed that they could. They believed that they had smoking-gun evidence that was going to show that she couldn't have done it, that she must be lying. The way they were going to do that is they were going to show at the time when some of these log-ins occurred to his Hotmail account from her work at United Health Group, it was the same time that some of these log-ins occurred in Jessica Hensley's accounts. You just heard in a very strident fashion [the AUSA] explain that means she couldn't be in two places at one time, so it was a lie and [Bennie Wilcox] did it. Now, she did give testimony that explained that. She explained that she had a friend of hers, and at this time she was obsessively worried about him having an affair. She had a friend of hers at work who was checking this account.

22

Those statements and other statements made by Brindley during the course of the underlying cases are non-hearsay coconspirator statements under Rule 801(d)(2)(E) as they were made in furtherance of and in order to achieve the objects of the conspiracy described above and in the indictment.

## VI.     EVIDENCE ADMISSIBLE WITHOUT REGARD TO RULE 801(d)(2)(E)

The statements described above and many others are also admissible non-hearsay under Rule 801(d)(2)(A), (B), (C), or (D).  In addition, many of the same statements are non-hearsay because they would not be admitted for truth of the matter asserted. *See* Rule 801(c)(2).

### A.     Statements Admissible Under FRE 801(d)(2)(A) – (D)

Aside from the coconspirator exception under Rule 801(d)(2)(E), relevant statements by Brindley and Thompson, and other attorneys employed at the Law Office are admissible non-hearsay under Rule 801(c) because they qualify as statements of an opposing party under Rule 801(d)(2)(A) through (D).  Under Rule 801(d)(2)(A) through (D), a statement is not hearsay if the "statement is offered against an opposing party and (A) was made by the party in an individual or representative capacity; (B) is one the party manifested that it adopted or believed to be true; (C) was made by a person whom the party authorized to make a statement on the subject; [or] (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."

Brindley's statements during closing arguments at Mr. Wilcox's trial, described above, would be admissible non-hearsay under Rule 802(d)(2)(A) because they qualify as statements which would be offered against Brindley and they are his own statements in either a individual or representative capacity.  Likewise, in the case of *In Re:* A Witness Before the Special September 2012 Grand Jury, Thompson's statements in a letter to an AUSA in Chicago in which he claimed to represent Charisma Tabor and asserted that Tabor would invoke her rights under the Fifth Amendment if

questioned before the Grand Jury are non-hearsay under FRE 802(d)(2)(A). Thompson's statements are equally admissible against Brindley because at the time Thompson made those statements while he was employed by the Brindley Law Office and the statements were made within the scope of his employment relationship. *See* FRE 801(d)(2)(D). It would be same result for other statements by Brindley and Thompson made during any of the relevant proceedings identified in the superseding indictment.

Another example would be a February 3, 2013 email Brindley sent from the email account bbrindley@brindleylaw.com to Josh Jones. The email related to the upcoming trial of Rahshone Burnett.[5] The subject line of the email was "Burnett cross." In the email, Brindley wrote, "Here it is. I think most shit is covered by this. I bolded a few important questions and the answers I think he should give. And covered all of the important calls. I'm sure you did too. So between the two of us, that should do it." Included with the email was an attached Word document titled "Cross Exam – Rahshone Burnett." The email was signed "BB." The Word document contained several bolded questions followed by answers Burnett should give, including the following question and answer, "You were polling your money, right? He wanted me to pay him to get heroin. What he was doing with anybody else's money I didn't know." Other potential cross-examination questions and suggested answers included the following: (a) "You sent him to a gas station to buy Dormins,[6] didn't you? He should say Tone might go buy Dormins when he was going to mix up heroin for

---

[5]Burnett was charged with conspiring to distribute heroin, in violation of 21 U.S.C. § 846. As proof of the conspiracy, the government alleged that Burnett pooled his money with Richard Harrington in order to buy heroin at a better price. Harrington testified falsely at Burnett's trial that he and Burnett did not pool their money to buy heroin.

[6]Dormin is a commonly used cutting agent for heroin.

himself. But he didn't work for me;" (b) "Telling him the amounts right? Make sure he sticks to – I was telling him what he was supposed to get so he didn't take too much [heroin];" (c) "The only reason for [Harrington] to tell you he had money in his pocket was because he was waiting for you to pool your money with his, right? On this, he should say Harrington was telling him he was going to buy some heroin and telling him where to meet so [Burnett] could buy some from him." The email from Brindley to Josh Jones is non-hearsay because it is a statement by Brindley. Additionally, a statement which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not invoke a an analysis under Rule 801(d)(2). Therefore, the potential cross-examination questions and the listed answers that Burnett should give are admissible non-hearsay. *See, e.g., United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985).

Of course, many of the statements made by the defendants and others in this case are not hearsay to begin with because they are not introduced to prove the truth of any assertion. Instead, they are "verbal acts;" things that were said which were relevant parts of the series of events. Such verbal acts are not hearsay. *Tompkins v. Cyr*, 202 F.3d 770, 779 (5th Cir. 2000); *United States v. Wesson*, 33 F.3d 788, 795 (7th Cir. 1994); *United States v. Ford*, 21 F.3d 759, 764 (7th Cir. 1994).

## B. Statements Not Offered for the Truth of the Matter Asserted

When a statement is not being offered for the truth of the matter asserted it does not constitute "hearsay" as defined by Rule 801(c). Accordingly, statements may be admitted against a defendant, without establishing the factual predicates necessary under Rule 802(d)(2) when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant was out of cocaine was not hearsay because it was not offered for its truth but as evidence

of membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988) ("war stories" about the drug trade were not offered for the truth); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988) (statements had non-hearsay value in establishing knowledge of and membership in conspiracy); *Tuchow,* 768 F.2d at 867-69 (pre-conspiracy statements admissible to set forth scope of the anticipated conspiratorial scheme).

Examples of evidence that would qualify as non-hearsay for this reason include the false testimony given Ms. Collazo, Mr. Myles, Ms. Wilcox, and Mr. Harrington. That would also be the case for documents like the proposed direct examinations Mr. Vasquez, Mr. Harrington, and Ms. Collazo. Additionally, those documents are admissible to establish the existence, the illegality, or the nature or scope of the charged conspiracy.

## VII.    CONCLUSION

The United States respectfully requests that this Court find, based upon this proffer, that coconspirator statements are admissible pending the introduction of evidence to support this proffer. The United States further requests that this Court find the statements are otherwise admissible for the reasons described above.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney General

JAMES L. SANTELLE
United State Attorney
Eastern District of Wisconsin

By:        *s/Michael Chmelar*
MICHAEL CHMELAR
Assistant United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Avenue
Milwaukee, WI, 53202

*s/Mel Johnson*
MEL JOHNSON
Assistant United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Avenue
Milwaukee, WI, 53202

Dated: July 17, 2015